

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

September 3, 2024

<u>BY ECF</u>
The Honorable Loretta A. Preska
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re: ***United States v. Jesus Concepcion*, S1 21 Cr. 479 (LAP)**

Dear Judge Preska:

    The Government respectfully submits this letter in advance of the September 10, 2024 sentencing of the defendant, Jesus Concepcion. For the reasons set forth below, the Court should sentence Concepcion to a sentence of at least 45 years' imprisonment for his heinous crimes. Such a sentence is sufficient but not greater than is necessary to serve the purposes of sentencing.

**I. Preliminary Statement**

    For seven years between in or about 2000 and 2007, the defendant—who was then 27 to 34 years' old and a music and orchestra teacher at a Bronx middle school—sexually abused five girls who were each approximately 12 to 16 years old at the time (the "Victims"). Concepcion's sexual abuse included kissing, oral, anal, and vaginal sex. Concepcion plied the Victims with gifts, such as cash, jewelry, and cellphones, and extra attention to groom them for his sexual gratification. He lied, manipulated, and took advantage of the trust the children, their families, and the members of the school community placed in him. He even threatened one of his Victims with physical harm if she told anyone about what his sexual abuse of her and her younger sister.

    Two days before the start of trial, and after two years of pre-trial litigation including multiple trial adjournments—which forced the Victims to re-live their trauma over and over again while preparing to testify—Concepcion pled guilty to a ten-count superseding indictment (the "Indictment"). The Indictment charged him with five counts of coercion and enticement (one count for each of the Victims), four counts of transportation of a minor with intent to engage in illegal sexual activity, and one count of travel with intent to engage in illegal sexual activity with a minor. For this conduct, Concepcion faces a ten-year mandatory minimum sentence and a maximum sentence of life.[1]

---

[1] The version of the Government's Sentencing Submission (filed on 9/3/2024) incorrectly stated that Concepcion faces a maximum sentence of at least 45 years' imprisonment. The maximum penalty that Concepcion faces is life imprisonment, which has been corrected above.

Concepcion comes before this Court requesting a mandatory minimum sentence of ten years' imprisonment. For the reasons set forth herein, such a sentence is grossly insufficient to account for the heinous nature of the defendant's crimes, the need for specific deterrence and to protect the public, and the need for general deterrence and to promote respect for the law. The Government respectfully submits that the only sentence sufficient in this case is one of at least 45 years' imprisonment. This recommendation is not made lightly. Concepcion is a serial sexual abuser who manipulated and took advantage of some of society's most vulnerable—children from challenging economic circumstances. The Victims depended on the defendant for guidance and support in what should have been a safe place—their school. Concepcion's heinous and vile conduct destroyed the trust that the Victims and their families placed in the defendant and continued unabated for years until one of the Victim's parents intercepted messages from the defendant to their 13 year-old daughter and reported him. The end of the sexual contact was not the end of the abuse, however. The defendant's conduct caused deep-seated psychological harm that the Victims continue to grapple with to this day. Looking at the Section 3553(a) factors together, a significant sentence is absolutely necessary in this case.

## II.  Background

### A.  Procedural Background

On March 16, 2023, a grand jury returned the Indictment charging Concepcion with offenses relating to his sexual abuse of five Victims. (Dkt. 74). Counts One, Two, Three, Four, and Five charged Concepcion with enticement of a minor, in violation of 18 U.S.C. §§ 2422(b) and 2. Count Six, Seven, Eight, and Nine charged Concepcion with transportation of a minor with intent to engage in illegal sexual activity, in violation of 18 U.S.C. §§ 2423(a) and 2, and Count Ten charged him with intent to engage in illegal sexual activity with a minor, in violation of 18 U.S.C. §§ 2423(b) and (2).

On September 11, 2023, two days before trial was scheduled to begin, Concepcion pleaded guilty to the Indictment. After multiple adjournments, he is scheduled to be sentenced on September 10, 2024.

### B.  Offense Conduct

From at least in or about 2000, up to and including at least in or about 2007, the defendant was a music teacher and orchestra instructor at a middle school in the Bronx, New York ("School-1"). (PSR ¶ 18). During this period, the defendant groomed and sexually abused multiple middle school students whom he instructed either during or before the sexual abuse occurred. The defendant's *modus operandi* was consistently sinister. He began by showing his intended victims special attention. He then groomed and manipulated them with gifts such as cash, sneakers, jewelry, and cellphones. Then he coaxed them into believing they were in a relationship with him, contacting them repeatedly and outside of school hours and arranging to meet with them alone. The defendant used the Victims' lack of resources as means to gain access to them in and outside of school, offering them rides and inviting them to group hangouts. The defendant exploited his position of trust to get the Victims alone without raising the suspicions of their families. Eventually, the defendant secluded the Victims and engaged in ever increasing physical contact,

culminating in kissing, oral, anal, and vaginal sex. The Victims were all between approximately 12 to 16 years old at the time of the sexual abuse.

### i. Minor Victim-1

Concepcion was Minor Victim-1's music and orchestra teacher at School-1, which she attended from 1999 to 2003, when she was approximately ages of 10 and 13. In or about January 2002, when Minor Victim-1 was approximately 12 years old, Concepcion kissed Minor Victim-1 in an instrument storage room after a performance with the School-1 orchestra. (PSR ¶ 19). Immediately thereafter, Concepcion began having oral, anal, and vaginal sex with Minor Victim-1 multiple times per week at multiple locations, including School-1, a motel, and one of the defendant's residences in New Jersey. (PSR ¶ 20). Concepcion led Minor Victim-1 to believe that they were in a romantic relationship. (PSR ¶ 19). Minor Victim-1 understood that the relationship with Concepcion was forbidden because he was her teacher, and therefore kept it a secret from her friends and family. Concepcion gave Minor Victim-1 a cellphone to arrange sexual encounters, and he bought Minor Victim-1 a corsage for School-1's prom. (PSR ¶ 20).

Concepcion continued abusing Minor Victim-1 even after she graduated from School-1 and began attending a boarding school in Connecticut for high school. On one occasion, in the fall of 2003, when Minor Victim-1 was approximately 14 years old, the defendant visited Minor Victim-1 in Connecticut at her high school. During this visit, the defendant sexually abused Minor Victim-1 again. He took her to the movies, and afterwards, he had vaginal sex with Minor Victim-1 in his vehicle. (PSR ¶ 21).

### ii. Minor Victim-2

Concepcion was Minor Victim-2's music and orchestra teacher at School-1, which she attended from 1999 to 2003, between the approximate ages of 10 and 14. In or around late 2000 to 2001, when Minor Victim-2 was approximately 11 to 12 years old and in the sixth grade, the defendant began making sexual advances toward Minor Victim-2; he leered at her and commented on her developing body. (PSR ¶ 22). Towards the end of the sixth grade, the defendant kissed Minor Victim-2 in the instrument storage room at School-1. Thereafter, the defendant began showering Minor Victim-2 with money and gifts, including a music album, sneakers and a cellphone that he used to communicate and arrange meetings with her outside of school. (*Id.*). While she was in the sixth grade, Concepcion told Minor Victim-2 that he loved her, that she was the love of his life, and that he would leave his wife for her. (Minor Victim-2's Impact Statement at 1). Minor Victim-2 understood that their communications needed to be kept secret, and she created an email account that she used only to communicate with Concepcion. (PSR ¶ 22).

Concepcion began fondling and engaging in oral sex with Minor Victim-2 when she was approximately 12 to 13 years old and in the seventh grade. Concepcion touched Minor Victim-2's genitals and performed oral sex on her, and he made her do the same to him. (PSR ¶ 23). Concepcion would have Minor Victim-2 sneak out of class to engage in sexual acts with her. The sexual abuse also occurred when Concepcion drove Minor Victim-2 home from school, which typically occurred multiple times per week. (*Id.*). Although she was only about 12 to 13 years old, Minor Victim-2 believed she was in a relationship with the then approximately 29- to 30-year-old Concepcion. (PSR ¶ 22, p.4).

In or about June 2003, Concepcion had vaginal sex with Minor Victim-2 for the first time when she was approximately 14 years old and in the eighth grade. After having vaginal intercourse, with Minor Victim-2, Concepcion allowed her to drive his vehicle while he smoked a cigar. (PSR ¶ 24). Thereafter, the defendant regularly engaged in sexual activity, including vaginal and oral sex, with Minor Victim-2 at various locations, including a motel in New Jersey, at School-1, in the defendant's vehicle, and at residences in New Jersey and New York. (*Id.*). Minor Victim-2 understood that the relationship with Concepcion was forbidden because he was her teacher, and therefore kept it a secret from her friends and family. (*Id.*).

Concepcion continued his abuse of Minor Victim-2 for years after she graduated from School-1 and while she attended a boarding school in Pennsylvania ("School-3") for high school. (PSR ¶ 25). During that time, Concepcion paid, on multiple occasions, for Minor Victim-2 to travel from Pennsylvania to visit him in New York, where he engaged in sexual intercourse with her. (PSR ¶ 26). Throughout her time in high school, Concepcion continued giving Minor Victim-2 cash and paying for her cellphone, which she used to communicate with him, including to arrange meetings with him. (PSR ¶ 25).

### iii.  Minor Victim-3

Concepcion was Minor Victim-3's music and orchestra teacher at School-1, which she attended from 1997 to 2001, between the approximate ages of 9 and 13. (PSR ¶ 27). Between 2001 and 2005, after Minor-3 had graduated from School-1 and was attending high school, Minor Victim-3 returned regularly to School-1 to attend college prep courses and to tutor the then-current School-1 students. In or about the summer of 2003, when Minor Victim-3 was approximately 15 years old, Concepcion's conversations with Minor Victim-3 became sexually explicit. (*Id.*).

During fall 2003, Concepcion began teasing Minor Victim-3 and embarrassing her in front of others about the material things she could not afford. (*See* PSR ¶ 28). After much pressure from Concepcion, Minor Victim-3 accepted his offer to pay for her high school graduation ring; Concepcion then told Minor Victim-3 to lie to her parents and tell them that School-1 had funded the purchase of the ring. (*Id.*). Concepcion continued to manipulate Minor Victim-3, and a few months later, after pretending to need Minor Victim-3's help to pick out sneakers for his daughter, Concepcion purchased three pairs of sneakers for Minor Victim-3. Minor Victim-3 felt obligated to accept Concepcion's purported generosity, and he again told her to lie to her parents about the source of the funds for the gifts. (PSR ¶ 29).

Like with Minor Victim-1 and Minor Victim-2, Concepcion used gifts and extra attention to groom Minor Victim-3. Although Minor Victim-3 was hesitant to meet Concepcion away from School-1, he insisted and became upset when Minor Victim-3 failed to meet him at an agreed upon time. Out of a sense of obligation because of Concepcion's purported generosity to her, in or about early 2004, Minor Victim-3 met with Concepcion away from School-1. (PSR ¶ 30). During that first visit, Concepcion took Minor Victim-3, who was approximately 16 years-old, to a motel in New Jersey where he engaged in oral and vaginal sex with her. Thereafter, the defendant engaged in sexual activity with Minor Victim-3 several times per month at motels in New Jersey and in Pennsylvania, at School-1, and in his vehicle in and around the Bronx, New York. (PSR ¶ 31). Concepcion also gave Minor Victim-3 a cellphone to arrange their meetings, and he asked her to take and send him sexually explicit photos. (*Id.*).

After months of sexually abusing Minor Victim-3, in late 2004, Concepcion directed Minor Victim-3 to share the cellphone he had purchased for her with her younger sister, Minor Victim-4, his then middle school student at School-1. (PSR ¶ 32). Minor Victim-3 and Minor Victim-4 eventually stopped sharing the cellphone after Concepcion bought Minor Victim-4 her own phone. (*Id.*). By late 2004 or early 2005, Concepcion started asking to meet with Minor Victim-3 for sexual encounters less frequently. Instead around this time, Concepcion and another teacher from School-1 ("Teacher-1"), began spending time with Minor Victim-3 and Minor Victim-4 away from School-1 at places such as Teacher-1's home. Concepcion and Teacher-1 would often give an approximately 16 to 17-year-old Minor Vicitm-3 and an approximately 12 to 13-year-old Minor Victim-4 alcohol during these outings. (PSR ¶ 33).

On one occasion in Spring 2005, Concepcion and Teacher-1 took Minor Victim-3 and Minor Victim-4 to Atlantic City, New Jersey. Concepcion again instructed Minor Victim-3 to lie about her whereabouts to her parents: he made a fake permission slip on School-1 stationary and made up a cover story to tell their parents about where they would be. On that trip, Teacher-1 and Minor Victim-3 spent the day on the boardwalk, while Concepcion stayed in the hotel room with Minor Victim-4. (PSR ¶ 34).

One day while Concepcion, Teacher-1, Minor Victim-3, and Minor Victim-4 were in Teacher-1's basement, Minor Victim-3 saw her then 13-year-old sister straddling and kissing Concepcion. On that day, Minor Victim-3 realized that Concepcion was also sexually abusing Minor Victim-4. (PSR ¶ 35). Also, on that day Minor Victim-3 was sexually assaulted by Teacher-1 when he forced her to perform oral sex on him. (PSR ¶ 35, n. 2). After realizing that Concepcion was abusing her younger sister, Minor Victim-3 was racked with guilt and began contemplating telling someone about what Concepcion was doing to them. Concepcion figured out that Minor Victim-3 was considering revealing his secret to others, and to ensure her silence, Concepcion threatened to physically harm Minor Victim-3 and her family if she told anyone about his sexual abuse of her and her sister. Minor Victim-3 believed deeply that Concepcion would harm her and her family and has lived in fear of Concepcion's threats ever since. (*Id.*).

### iv.  Minor Victim-4

Concepcion was Minor Victim-4's music and orchestra teacher at School-1, which she attended from 2001 to 2005, between the approximate ages of 10 and 13. In or about the fall of 2003,[2] when Minor Victim-4 was in the seventh grade, Concepcion kissed Minor Victim-4 in his office at School-1. (PSR ¶ 37). Concepcion then began showering Minor Victim-4 with gifts including a ring resembling a wedding band, a necklace, cash, clothing, and a cellphone, which he used to communicate with her when she was not at School-1. Concepcion led Minor Victim-4 to believe that she was in a romantic relationship with him.  (*Id.*).

In or about summer 2004, when Minor Victim-4 was approximately 12 years old and entering the eighth grade, Concepcion brought Minor Victim-4 to a motel in New Jersey where he gave her alcohol and engaged in oral and vaginal sex with her. (PSR ¶ 38). Thereafter, Concepcion regularly and repeatedly had oral and vaginal sex with Minor Victim-4, including at a hotel in

---

[2] The PSR incorrectly states fall 2004 was when Concepcion first kissed Minor Victim-4. That event occurred in or about fall 2003.

Atlantic City, New Jersey, at School-1, in his car, and at his residence. Minor Victim-4 understood that the relationship with the defendant was forbidden because he was her teacher and kept it a secret from her friends and family. (*Id*.).

### v.   Minor Victim-5

Concepcion was Minor Victim-5's music and orchestra teacher at School-1, which she attended from 2004 to 2008, between the approximate ages of 10 and 14. (PSR ¶ 39). In or about spring 2007, when Minor Victim-5 was approximately 13 years old and in seventh grade, Concepcion began exchanging text messages by cellphone with Minor Victim-5. (*Id*.). Over a period of months, the text messages became personal, flirtatious, and voluminous. Concepcion texted Minor Victim-5 at all hours of the day, including during the school day, evenings, and on weekends. Concepcion also gave Minor Victim-5 one of his watches, which she hid from her parents. (*Id*.). Concepcion's conduct led Minor Victim-5 to believe she was in a relationship with him, which she understood was forbidden, and so she kept it a secret from her friends and family. (*Id*.).

In or about fall 2007, when Minor Victim-5 was approximately 13 years old and in eighth grade, Concepcion messaged Minor Victim-5 on her cellphone during the school day and asked her to come to his office. Once in his office, Concepcion "dared" Minor Victim-5 to kiss him. There, he kissed Minor Victim-5 and inserted his tongue into her mouth. (PSR ¶ 40). After Concepcion kissed Minor Victim-5, he began pressuring her to see him by herself outside of School-1. Minor Victim-5, fearing that Concepcion wanted their relationship to become more physical, backed out of meeting him outside of school. (PSR ¶ 41).

Shortly thereafter, Minor Victim-5's parents discovered approximately 1,400 text messages between Minor Victim-5 and Concepcion. Minor Victim-5 admitted to her parents that she had exchanged the text messages with Concepcion, and that they had kissed. Minor Victim-5's parents reported the conduct to School-1 administrators and to local law enforcement. Soon thereafter, Concepcion was terminated from School-1 and arrested for his conduct with Minor Victim-5. (PSR ¶ 42).

### vi.   Student-1

The defendant's pattern of abuse began even before working at School-2. In addition to abusing the Victims at School-1, the defendant also engaged in a sexual relationship with another student at the Bronx high school where he worked before School-1. (PSR ¶ 44). In or about 1999, while the defendant was employed as a music instructor at the high school ("School-4"), he initiated a sexual relationship with an 18 year old female student ("Student-1"). (PSR ¶ 44). The relationship began when Concepcion asked Student-1 to meet with him outside school hours alone. (*Id*.). The relationship became physical when Concepcion asked Student-1 for a kiss. (PSR ¶ 45). Concepcion then began driving Student-1 home from School-4 and soliciting oral sex from Student-1 while they were in the car. While Student-1 attended School-4, the relationship took place in secret. (*Id*.). Student-1 understood that the relationship was inappropriate because Concepcion was her teacher, and she did not disclose it to anyone until her School-4 graduation. (*Id*.). To engage in sexual activity, the defendant drove Student-1 to motels in New Jersey where

they would engage in oral and vaginal sex. During their relationship, the defendant gave Student-1 gifts of cash, jewelry, and a pager, which he used to communicate with Student-1. (*Id.*).

## C. Concepcion's Post-Arrest Conduct

### i. Embezzlement and Threats to Others

Shortly after his arrest for the instant offense, Concepcion's embezzlement at his last employer (the "Employer") was uncovered. (PSR ¶¶ 117; 147). Concepcion was able to devise the embezzlement scheme because of the great trust and significant authority that his Employer placed in him. (*See, U.S. v. Concepcion*, 23 Cr 818 (D.S.C.), Dkt. No. 1, (Indictment), ¶¶ 2-7). Concepcion abused that trust and hired a company he owned (never disclosing his ownership interest) as an employee recruiting service. (*Id.*). He then placed his family members (including his wife) and friends on the payroll even though they didn't work at the company or in low level positions with compensation far greater than was commensurate with their roles. Some of the funds received by Concepcion's friends and family were funneled back to Concepcion. (*Id.*). Concepcion also issued to himself substantial unapproved bonuses. Concepcion's deception led to over $5,000,000 being misappropriated from his Employer. (*Id.*). In response to his scheme being uncovered, while in custody, Concepcion directed his associate to threaten and harass his Employer. He also placed threatening calls to his Employer himself, while in custody. (PSR ¶ 117; *see also*, Motion to Revoke Bail, Dkt. No. 14).

### ii. Conduct at Metropolitan Detention Center ("MDC")

Since his arrest, Concepcion has been sanctioned at the MDC on four occasions. On March 16, 2024, Concepcion was working as an orderly and two cellphones were discovered in a mop closet that he had access to. Concepcion admitted to storing the cellphones in the closet and provided the pins to unlock both cellphones. Concepcion was sanctioned 41 days' loss of good conduct time, 30 days' disciplinary segregation, and 120 days' loss of commissary and visitation. (PSR ¶ 14). Concepcion was sanctioned on three other occasions between April 2024 and June 2024 for refusing work/program assignments and refusing to obey orders. Each occasion arose from Concepcion's refusal to leave the Segregated Housing Unit ("SHU") ███████████. He was sanctioned with 30 days' loss of visitation, and suspended 60 days on one occasion, with 30 days' loss of commissary and visitation on another occasion, and on the third occasion he was sanctioned 30 days' loss of email and visitation. (*Id.*).







### D. The Guidelines Range

The Probation Office calculated Concepcion's combined adjusted offense level as 40 based on § 2G1.3, the applicable Guideline for Count One through Ten, and the grouping analysis pursuant to § 3D1.4. (PSR ¶¶ 53-105). An additional five points were added because the defendant engaged in a pattern of activity involving prohibited sexual conduct pursuant to § 4B1.5(b)(1) and two points were then deducted pursuant to §3E1.1(a) because the defendant demonstrated acceptance of responsibility, resulting in a total offense level of 43. (PSR ¶¶ 106-108).

The Probation Office then found that Concepcion criminal history category was I, based on 1 criminal history point arising from a conviction for driving while impaired by the consumption of alcohol. (*See* PSR ¶¶ 111-113). With an offense level of 43 and a criminal history category of I, the Probation Office found that the Guidelines range was life imprisonment. (PSR ¶ 161).

### III. The Probation Office's Sentence Recommendation

The Probation Office recommends a below-Guidelines term of imprisonment of 30 years, in addition to a 10-year period of supervised release on each Count of conviction. (PSR at 39). In coming to this conclusion, the Probation Office noted that the instant offense represents Concepcion's third criminal conviction. (PSR at 40). The Probation Office acknowledged potentially mitigating factors, including Concepcion's father dying when he was an infant and being raised by a single mother who worked long hours, living without electricity or running water for a year, growing up in a high crime and drug infested neighborhood, significant financial responsibilities for his infant daughter, his sister, and two college-aged nieces, as well as his completion of over 200 hours of institutional programing and holding multiple work details while at the MDC. (*Id.*). But the Probation Office explained that "[w]hile these are factors that may

warrant a variance pursuant to 18 USC § 3553(a), there were significant aspects of the defendant's history and the conduct in this case that warrant a substantial custodial sentence." (*Id.*) The aggravating factors included, among other things, Concepcion's predatory and manipulative behavior where he used "his position as a teacher to build rapport with the Minor Victims who came from families with limited financial means," and using gifts, money, cell phones, and sexual conversations and innuendos to groom the Victims. (*Id.*). The Probation Office also noted as an aggravating factor that over a "seven-year period, Concepcion targeted his female students and sexually abused the five Minor Victims by engaging in kissing, oral, vaginal and anal sex with them. (*Id.*).

The Probation Office also pointed out that the independent psychosexual evaluation concluded that Concepcion presented an average risk of recidivism, and they noted that it was "worrisome" that Concepcion had not been forthcoming about the extent of his past alcohol issues. (PSR at 41). U.S. Probation also reasoned that Concepcion's psychiatric evaluation's conclusion "that [Concepcion's] offense was driven by his alcohol consumption underscores Concepcion's risk of recidivism as addiction and alcoholism are lifelong issues and it will be impossible for him to avoid all postpubescent adolescents in the community." (*Id.*). Accordingly, the Probation Office determined that a 360-month term of imprisonment was needed to specifically to account for the seriousness of the offense, promoting respect for the law, providing just punishment for the offense, affording adequate deterrence to criminal conduct, and protecting the public from further crimes of the defendant. (*Id.*).

Finally, the Probation Office recommended a supervised release term of ten years, which it did "not recommend lightly." (*Id.*). However, the Probation Office explained that such a term of supervised release is appropriate "due to the danger the defendant presents to the community as evidenced by prolonged sexual victimization of multiple minors over a seven-year period and blatant disregard for the law." (*Id.*).

## IV.  Discussion

### A.  Applicable Law

Following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Guidelines continue to provide a critical touchstone. Indeed, while the Guidelines are no longer mandatory, they remain in place, and district courts must "consult" them and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)–(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

> (B) to afford adequate deterrence to criminal conduct;

> (C) to protect the public from further crimes of the defendant;

> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## B. The Court Should Impose a Sentence of at Least 45 Years' Imprisonment

The Government respectfully submits that a Guidelines sentence of at least 45 years' imprisonment is sufficient, but not greater than necessary, to serve the purposes of sentencing, particularly in light of (i) the seriousness of Concepcion's conduct and the need to provide just punishment for the offense, (ii) his history and characteristics, the need for specific deterrence, and the need to protect the public, and (iii) the need for general deterrence and to promote respect for the law.

*First*, a sentence of at least 45 years' imprisonment is necessary to reflect the seriousness of Concepcion's conduct and the need to provide just punishment for the offense. For at least seven years, Concepcion sexually, emotionally, and psychologically abused five of his students, beginning when they were as young as 12 years-old. He employed the same tactics repeatedly: he plied each victim with extra attention; he gave them gifts and cash; he had them meet him somewhere private, usually at School-1 where they were comfortable; then he would ask the young girls for a kiss. Shortly thereafter, and before four of the five Victims fully realized what was happening, Concepcion was engaging in more serious sexual conduct with them, such as fondling, and oral and vaginal sex. Concepcion preyed on their innocence, naiveté, and trust in him as their teacher. Instead of keeping them safe, he violated their bodies. Sexual abuse of children is always an extremely serious offense. But that Concepcion sexually abuse multiple students placed in his care, repeatedly, over seven years is truly reprehensible. That he sexually abused two sisters, Minor Victim-3 and Minor Victim-4, truly underscores the egregiousness of the conduct. What's more, Concepcion threatened to physically harm Minor Victim-3 and her family to prevent her from telling anyone about his behavior. His threats of physical violence to Minor Victim-3 allowed him to continue his sexual abuse of Minor Victim-4 and ultimately Minor Victim-5. The heinous pattern of abuse only stopped because Minor Victim-5's parents intercepted inappropriate communications and reported the conduct to the school. Simply put, Concepcion's conduct was absolutely vile and horrific, and warrants decades in prison.

The harm that Concepcion inflicted upon his Victims with his abuse is enormous. And, unfortunately for the Victims, that harm has persisted for many years and will likely continue to

affect them for years to come. According to information collected by the Rape, Abuse, & Incest National Network ("RAINN"), the nation's largest anti-sexual violence organization, child sexual abuse like the kind that victims suffered at the hands of Concepcion can have long term effects on victims. *See Victims of Sexual Violence: Statistics*, RAINN, https://rainn.org/statistics/children-and-teens (last visited: September 1, 2024). For example, the victims of child sexual abuse are four times more likely to develop symptoms of drug abuse; four times more likely to develop symptoms of post-traumatic stress disorder; and three times more likely to experience a major depressive episode as adults. *Id.*

Indeed, the Victims have reported that two decades later they continue to suffer from the aftermath of Concepcion's abuse. In her impact statement, Minor Victim-1 reports that for "decades now, [she has] struggled with severe depression, anxiety, and insecurity issues that [she] knows began when [she] was 12 years old," after Concepcion began sexually abusing her. (Minor Victim-1 Impact Statement at 2). Minor Victim-1 also reports that that she "doesn't trust any man" and "haven't since she was 12," and that she often reverts back to her 12-year-old self when dealing with conflict. (*Id.*). Minor Victim-2 reports that Concepcion's abuse "caused deep abandonment and self-worth wounds." (Minor Victim-2 Impact Statement at 2). Once she realized that she was a victim of abuse, and that her so-called relationship with the defendant was not real, it "shattered her reality and what she knew to be true." (*Id.*). Twenty-three years later Minor Victim-2 continues to "grieve" for the little girl that Concepcion abused, and she continues to work on "unlearning core belief and behaviors" that she learned from Concepcion's abuse. (*Id.* at 1-2). Minor Victim-3 reports that the guilt she felt for her sister's, Minor Victim-4, abuse, has endured, and many of the difficulties that remain in their relationship today can be traced directly back to Concepcion's abuse of them both. (PSR ¶ 117).

For these reasons, the seriousness of Concepcion's conduct and the need to provide just punishment for his offense cannot be overstated.  The sentence imposed must speak to the seven years of sexual abuse the five Victims endured as well as the decades-long aftermath. Further, a sentence of at least 45 years' imprisonment will let other victims of child sexual abuse know that when they take the brave step of reporting their abusers and revisiting their traumas, the criminal justice system will listen and will mete out just punishment.

*Second*, Concepcion's history and characteristics, the need for specific deterrence, and the need to protect the public from Concepcion, also support a sentence of at least 45 years' imprisonment. With each Victim, Concepcion manipulated them into sexual contact, and then with four of the five Victims, that contact included oral and vaginal sex with him. When the favor he curried from the extra attention and gifts didn't work, Concepcion used guilt and other tactics to lull the Victims into submission. For instance, with Minor Victim-2, when she didn't want to have sex with him, "he questione[d] her loyalty, ma[de] her feel bad and sa[id] 'I'll remember this.'" (Minor Victim-2 Impact Statement at 2). With Minor Victim-3, Concepcion guilted her into meeting him away from School-1 after pressuring her to accept what seemed to Minor Victim-3 as extremely generous gifts. (*See* PSR ¶¶ 28-30). He tried to employ the same tactic with Minor Victim-5 when he tried to pressure the then 13-year-old to meet him away from School-1 after giving her his watch. Fortunately, her parents found the text messages before Concepcion's abuse of Minor Victim-5 could go further. (*See* PSR ¶¶ 39, 41). Concepcion also used threats of violence to facilitate his abuse of the Victims: On multiple occasions, he threatened Minor Victim-3 with

physical harm to herself and her family if she didn't keep his sexual abuse of her and her sister a secret. (PSR ¶ 35).

Concepcion's manipulation was not limited to the Victims, as he has manipulated and taken advantage of other people and the institutions where he worked. For example, while Student-1 was about 18 years old when their relationship began, she was, like the Victims, Concepcion's student. Concepcion asked to see her away from school like the Victims and offered her rides home where he asked for sexual favors. Knowing that the relationship was inappropriate, Student-1 hid the relationship from her friends and family. This is another example of Concepcion using his position of power to obtain sexual gratification from a person with whom he knew he should not have such a relationship.

But Concepcion's manipulation was not only about his sexual gratification, he also manipulated people to obtain money and access that he was not otherwise entitled to. At Concepcion's last place of employment, he endured himself to his Employer and was placed in a position of trust and authority. Within a short period of time, Concepcion devised a large-scale fraud against his Employer. (*See* PSR ¶ 117, 147). As soon as he was placed in a position trust, Concepcion did as he usually does, take advantage for his own benefit and ultimately, in only about three years, he misappropriated over $5,000,000. Similarly, since his incarceration at the MDC, Concepcion has continued manipulating people and breaking rules for his own benefit. For example, he used the access his assignment as a laundry orderly provided to obtain two contraband cellphones that he used and hid in the mop closet that he only had access to because of his work assignment as an orderly.



At bottom, what Concepcion's conduct shows is that he is a master manipulator, who will take advantage of anyone or any institution for his own gain. He shows no indication that he can be trusted to be a part of law-abiding society given his demonstrated penchant for manipulating others.

*Third*, a sentence of at least 45 years' imprisonment is also necessary to ensure adequate general deterrence and promote respect for the law. The offense conduct in this case reflects extraordinarily serious criminal activity that harmed innocent children, caused lasting trauma to them and, by extension, to their family and their school community. The effect of Concepcion's conduct on the Victims, is enormous and far-reaching. It is important that any sentence imposed provide adequate deterrence to those who would similarly violate their positions of trust and power to engage in such conduct.

In sum, the combination of Concepcion's offense conduct and his history of manipulating people and institutions for his personal benefit clearly demonstrate that a significant sentence is necessary to incapacitate and deter Concepcion from engaging in further criminal conduct.

## C. Concepcion's Sentencing Submission

In his sentencing submission, Concepcion asks the Court for an unconscionably low sentence of 120 months' imprisonment. That sentence is not only decades below the Guidelines of life and Probation's recommendation, but it is also *the applicable mandatory minimum*. There is no justification for such a massive variance, and Concepcion's request should be rejected for that reason alone. Nevertheless, Concepcion points to several factors including his upbringing, family circumstances, his acceptance of responsibility, his time spent at MDC, and the purpose of the applicable Guidelines as purported justification for a downward variance. None of those factors justify a sentence that's less than the Government's recommended sentence.

*First*, Concepcion argues that his difficult upbringing, growing up in the epicenter of the crack and aids epidemic, that he excelled at school despite those circumstances, that spiraling from the loss of his mother led him to abuse alcohol, and how he turned his life around after leaving School-1 and receiving a DUI, as mitigating factors that justify a severely below-Guidelines sentence. (Def. Submission at 2-4). He is mistaken. While Concepcion growing up under difficult circumstances may be considered a mitigating factor, that he escaped that environment and became a successful Julliard-trained musician and teacher offsets the significance of that background. Further, while Concepcion did lose his mother shortly before his last tenure at School-1, that does nothing to explain away his conduct in this case. Death of loved ones is unfortunately a part of life that most people deal with at some point. Most people, unlike Concepcion, do not become serial child sexual abusers as a result. Concepcion did not have a brief lapse in judgment. Rather, he repeatedly preyed on the five vulnerable Victims over the course of seven years. None of Concepcion's characteristics or history can justify or explain the harm he inflicted on his Victims, and a sentence of at least 45 years' imprisonment is necessary to protect the public from his continued manipulative and abusive behavior.

*Second*, Concepcion argues that his acceptance of responsibility justifies the 10-year, mandatory minimum that he seeks. (Def. Submission at 2-4). But it does not. While Concepcion did eventually plead guilty, he took two years to enter that plea after multiple trial adjournments. That delay of his acceptance of responsibility revictimized the Victims. It forced them to re-live

their deep-seated traumas on multiple occasions over two years as they prepared to testify. Indeed, Minor Victim-1 reports the frustration and the weight that participating in this process has caused her, and how the process has "drained, exhausted [her] beyond words," and worn her patience thin. "This entire process has taken more from [her] than [she] could ever have imagined." (Minor Victim-1 Impact Statement). Concepcion's minimal acceptance of responsibility for his conduct, on the eve of trial, does not justify a ten-year mandatory minimum sentence given the egregiousness of his conduct, and the re-traumatization of the Victims from trial preparation.

*Next*, Concepcion argues that his risk of recidivism is low and points to Dr. Rene Sorrentino's psychosexual evaluation and Dr. Eric Goldsmith's psychiatric evaluation to support his argument. Neither evaluation supports a ten-year mandatory minimum sentence. Dr. Sorrentino's psychosexual evaluation of Concepcion, which he participated in willingly, established, among other things, that Concepcion had a 7.2% sexual recidivism rate in ten years and 8.9% sexual recidivism rate in twenty years. Dr. Sorrentino also noted that Concepcion demonstrated "clinically significant concerns for impulsivity, poor cognitive problem-solving, sex as coping, deviant sexual performance, and cooperation with supervision." Dr. Eric Goldsmith's psychiatric assessment of Concepcion, which he also participated in willingly, concluded that Concepcion's sexual abuse occurred because of his proximity to underaged female students, his active alcohol abuse condition, and ephebophilia, which is defined as having a problematic sexual attraction to postpubescent underage females. As noted by the Probation Office, these evaluations are especially troubling and do little to assuage concerns about Concepcion's future risk of reoffending. The evaluations attribute Concepcion's offense conduct to an alcohol abuse disorder, which is known to be a lifelong condition, and he continues to demonstrate areas of significant concerns such as impulsivity, sex as coping, and deviant sexual performance. These findings coupled with his ephebophilia diagnosis show that Concepcion's risk of reoffending is far too high for him to be trusted in the community where he would have access to alcohol and underage girls. Thus, a sentence of at least 45 years' imprisonment is necessary to protect the community from Concepcion.

Concepcion also cites his family and long employment history as mitigating factors against recidivism. Both arguments fail and do not support the drastic variance he seeks. Concepcion has continued engaging in criminal conduct despite his family and employment. Indeed, he involved many of his family members in latest deception and crimes—his multi-year embezzlement scheme against his Employer. (*See* PSR ¶ 117, 147).

*Fourth*, Concepcion argues that his conduct since his incarceration is a mitigating factor against recidivism and weighs in favor of a below-Guidelines sentence. Concepcion notes that he completed and received over 20 certificates, took 12 college courses, and tutored inmates in music and GED. (Def. Submission at 8-9). While completion of these programs is, in some small sense, a positive development it does not justify a mandatory minimum sentence given the seriousness of the defendant's conduct and his history of taking advantage of those around him, as described above. Concepcion's conduct at the MDC was far from stellar. He admitted to possessing two contraband phones that he used to communicate to the public. That conduct was a gross violation of the trust the institution placed in him with his assignment as an orderly ████████████

Concepcion also cites the difficult conditions at the MDC as justification for the below-Guidelines sentence he seeks. (Def. Sub. at 10-12). But the MDC conditions also do not justify the drastic variance that he seeks. While the defendant complains about frequent "lockdowns," he was not incarcerated at the MDC in 2020 or early 2021, at the height of the COVID-19 pandemic where there were more frequent lockdowns. And even when defendants were incarcerated at the height of the pandemic, courts found that the conditions at the MDC did not warrant "significant Guidelines departure[s]" requested by defendants. *See United States v. Stewart,* No. 21 Cr. 42 (WFK), 2023 WL 2599668, at *7 (E.D.N.Y. Mar. 22, 2023); *see also, e.g.*, *United States v. Sanchez*, No. 01 Cr. 74-2 (PAC), 2022 WL 4298694, at *2 (S.D.N.Y. Sept. 19, 2022) (finding, in context of compassionate release motion, that "the difficult—but generalized—prison conditions during the COVID-19 pandemic" do not constitute extraordinary and compelling circumstances for a defendant's release); *United States v. Boynton*, No. 20 Cr. 43 (RPK), 2022 WL 7131927, at *1 (E.D.N.Y. Oct. 12, 2022) (collecting cases to same effect).

Moreover, as of the first week of June 2024, DOJ personnel involved in MDC-related matters have confirmed that many of Concepcion's general complaints are being addressed by the MDC as follows:

- Medical Care: On May 15, 2024, the MDC implemented a new telehealth program to facilitate contact between inmate patients and medical providers in the community. This program makes use of newly installed telehealth equipment. To expand its reach of medical providers to those with guaranteed remote accessibility, the MDC entered into a new formal agreement with a local hospital not previously part of the BOP medical network. By allowing remote patient care, employees who would otherwise escort and supervise detainees during medical visits in the community are freed to focus on in-facility work and maintain a better staff to inmate ratio within the MDC's walls.

- Immediate Staffing Levels: The BOP has taken unprecedented steps to improve staffing at the MDC. In early 2024, all BOP employees (more than 37,000 people in total) received a message offering significant financial incentives for temporary duty assignments at the MDC, to address immediate staffing concerns. These financial incentives are being offered in addition to housing, food, and other incidental expenses that BOP pays for temporarily assigned personnel. Participation is open to BOP employees, including attorneys, doctors, counselors, chaplains, and correctional officers, with correctional officers receiving even greater financial incentives. No other BOP facility has benefitted from a temporary assignment call of this scale, and this exceptional effort has led to a surge in the number of the employees at the MDC.

- Long-Term Staffing Levels: The BOP has also undertaken measures to ensure staffing challenges at the MDC are addressed in the months and years ahead, not only through temporary assignments. To retain qualified employees, the MDC implemented a 35% retention pay incentive for most incumbent employees. Large hiring events are also being held in the community on a regular basis, as recent as on May 15, 2024. During that event, MDC Brooklyn was able to make more than 35 conditional offers using Direct Hire Authority, which OPM approved for MDC earlier this year. A 25% relocation and recruitment incentive has also been put into effect to increase interest in MDC vacancies.

Between October 1, 2023, and May 31, 2024, MDC has hired 48 new staff members which includes 33 correctional officers, seven medical personnel (including one Paramedic, one Mid-Level Practitioner, three registered nurses, a psychologist, and a pharmacist), two attorneys, one legal assistant, one accounting technician, one case manager, two time & leave clerks, and one unit secretary. As of May 31, 2024, there are currently 66 active tentative offers which have been extended to interested and qualified Correctional Officer and Medical applicants. With its mid-May 2024 inmate population of approximately 1,375 persons and permanent staff total of approximately 457, the staff to inmate ratio is 2.9 inmates per employee. An additional 173 positions are authorized and funded, pending selection of qualified applications. Assuming a consistent inmate population, this will bring the staff to inmate ratio to 2.1 inmates per employee.

- <u>Building Infrastructure</u>: The MDC has made significant structural repairs in recent months as well. Hundreds of outstanding building issues were addressed when teams of specialized staff were temporarily deployed to the facility. These projects included construction of 20 private phone booths for direct attorney-client access, an energy efficient system for water conservation, security lightning installed along the front perimeter, new security camera monitors, and various in-cell repairs (e.g., plumbing, electrical, temperature control).

- <u>Food Services</u>: The BOP is in the process of replacing two ovens in MDC's Food Services area of the facility. As of mid-May 2024, installation is pending. In addition, MDC responded swiftly to claims of contaminants in inmate food by identifying that one specific item (a particular type of beans) had weevils in it. Since that time, MDC personnel have routinely inspected sample food trays and responded directly to units in which inmates have complained of food contaminants to ensure that no widespread problem exists. MDC is also reviewing its menu and ingredients, in conjunction with a discussion of the national BOP menu—to mitigate the risk of contamination in the future.

The Government submits that a sentence of at least 45 years' imprisonment—a prison term that is significant but still below the applicable Guidelines range of life—is sufficient but not greater than necessary to account for the seriousness of Concepcion's conduct, the need to provide just punishment for the offense, his history and characteristics, the need for specific deterrence, the need to protect the public, the need for general deterrence, and the need to promote respect for the law. Concepcion repeatedly took advantage of the Victims when they were children. He groomed them and then abused them for his own sexual and psychological benefit. Concepcion has been convicted of some of the most serious of crimes, and society must be protected from him. Nothing short of the Government's requested sentence will be adequate to protect society from so dangerous an offender.

## Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a Guidelines sentence of at least 45 years' imprisonment.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

by: _____
Camille L. Fletcher
Alexandra S. Messiter
Jacqueline C. Kelly
Assistant United States Attorneys
(212) 637-2383 / 2544 / 2456

cc:    Raoul Zaltzberg, Esq. (by ECF)